UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

RQSI GLOBAL ASSET ALLOCATION  PLAINTIFF
MASTER FUND, LTD

v.  CIVIL ACTION NO. 3:15-CV-00778-CRS

APERÇU INTERNATIONAL PR LLC
    *and*
ALVIN WILKINSON  DEFENDANTS

## MEMORANDUM OPINION

Defendants Aperçu International PR LLC ("Aperçu") and Alvin Wilkinson (collectively, the "Defendants") move to dismiss all Plaintiff RQSI Global Asset Allocation Fund, LTD's ("RQSI") claims. RQSI has alleged gross negligence, fraud, fraud by omission, and breach of contract claims against Defendants. The Court will dismiss RSQI's claims with prejudice.

## BACKGROUND

This case concerns a futures and options trading advisory relationship that soured. The following facts are undisputed unless otherwise noted.

In January 2015, Aperçu, whose principal was Wilkinson, entered into a Trading Advisory Agreement ("TAA") with RQSI. In April 2015, Aperçu began directly managing assets that RSQI placed in a margin trading account with Société Générale Americas Securities, LLC ("Société Générale"). Aperçu had discretion over purchasing and selling futures and options in this account.

The trading strategy broadly involved trading stock futures and options on margin. Margin trading involves using borrowed money for a portion of an account's trades. For example, a client would deposit a sum of money in the account and borrow additional funds from the custodian bank to use for trading. A trader trades on the margin through a margin account usually held by a broker or custodian of assets – here, Société Générale acted as the custodian of assets. The account manager could then invest the entire amount including the borrowed sum. However, the initial equity investment must always equal a pre-arranged percentage of total invested assets. This amount varies and is contractually determined between the client investor and the asset custodian – here, RSQI and Société Générale. If stock market volatility causes some assets to lose value, for example, the bank may demand additional funds from the investor to meet the minimum requirement to maintain the margin account. This demand is known as a margin call.

The TAA set the margin limit at $1,000,000. *See* Schedule A, ECF No. 1-2. A margin limit breach may trigger a margin call. Also, here, the TAA sets out that Aperçu is to "make best efforts to reduce risk and/or execute hedging trades in order to bring the margin below the Margin Limit within 1 business day." *Id.* The TAA allows RSQI to suspend or terminate the agreement if Aperçu failed to maintain the margin below the limit. *Id.* RSQI could change the margin limit at any time under the TAA. *Id.*

Trading options and futures, especially on margin, is financially risky. RSQI acknowledged this in the TAA:

> [RSQI] understands and acknowledges that (i) the trading of options and futures is highly speculative and involves a high degree of risk, including the risk of loss in excess of the amount initially invested, that the trading strategies of [Aperçu] will be speculative, (ii) there can be no assurances that profits will be realized, or losses avoided or limited, as a result of the trading activities conduct by [Aperçu].

TAA § 7(f).

Approximately a month after Aperçu implemented the trading strategy, RSQI allegedly informed Wilkinson that "he should not add further risk exposure, and should plan and prepare for the account to be closed at year-end, if not immediately after December options expiration." Am. Compl. ¶ 34, ECF No. 4. RSQI also allegedly informed Wilkinson "to keep the margin … in the $600,000-$700,000 range it was in at that time." Am. Compl. ¶ 35.

The strategy produced volatile results. On June 29, 2015, the account's year-to-date profit was approximately $1,300,000. Am. Compl. ¶ 36. The following day, the account lost approximately $622,000. *Id.* On July 1, 2015, the account recouped nearly the entire loss. *Id.* According to Defendants, the account's peak profit was approximately $2,900,000 in August 2015. Defs.' Mem. Supp. Mot. Dismiss 5, ECF No. 6-1. The steep loss in June, however, caused Société Générale to issue a margin call.

On July 10, 2015, RSQI told Wilkinson that the $1,000,000 margin limit was breached. Am. Compl. ¶ 38. Wilkinson allegedly told RSQI that the breach was a temporary issue due to market volatility and that the portfolio risk had not increased. *Id.* RSQI also allegedly told Wilkinson a temporary margin increase was "understandable," but should then decrease to the $600,000 to $700,000 range. *Id.*

While the margin initially went below $1,000,000 the following week, it continued to increase through July and August. *Id.* During this period, RSQI alleges Defendants altered the trading strategy in such a way that the risk of losses increased. These alleged changes included, for example, less emphasis on attempting to cover losses or hedging, and instead "doubling down" on certain positions. Am. Compl. ¶ 43.

Between August 21 to August 24, 2015, the portfolio "suffered a catastrophic loss of … capital." Am. Compl. ¶ 45. The trading account initially lost approximately $10,000,000. Am. Compl. ¶ 51. By the end of the week, the account lost an additional $4,000,000. *Id.* In response, Société Générale issued a margin call for $42,600,000 to meet the minimum equity requirements of the margin account. *Id.* RSQI did not have sufficient assets to meet the margin call, so it borrowed money. On August 30, 2015, RSQI revoked Aperçu's power of attorney over the account and hired a consultant to assist in asset liquidation.

RQSI brought suit against Defendants, seeking:

> Loss of invested funds; adverse impact on profit and loss resulting from the breach of the agreed upon margin and [Value-at-Risk] constraints, losses resulting from the … margin call, potential future losses from continued exposure during the process of liquidating the Fund's portfolio, additional trading costs incurred in an attempt to mitigate damages, effects of any market impact that Defendants' improper trades may have had on pricing, opportunity costs from redeployed capital from or to other investments, lost time and resources related to managing and liquidating the portfolio after revoking Aperçu's Power of Attorney, and foregone management fees.

Am. Compl. ¶¶ 65, 70, 76, and 80.

## STANDARD

When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although the complaint need not contain "detailed factual allegations," "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal

quotation marks and alteration omitted). The complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 127 (2007) (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

RSQI asserts claims of gross negligence, fraud, fraud by omission, and breach of contract against Defendants. Defendants argue that RSQI cannot recover any of its alleged damages and that each of its stated claims cannot warrant relief on their face.

**1. Damages Alleged**

Defendants argue that RSQI has failed to allege recoverable damages because it waived these damages in the TAA. RSQI alleges the following damages:

> Loss of invested funds; adverse impact on profit and loss resulting from the breach of the agreed upon margin and [Value-at-Risk] constraints, losses resulting from the … margin call, potential future losses from continued exposure during the process of liquidating the Fund's portfolio, additional trading costs incurred in an attempt to mitigate damages, effects of any market impact that Defendants' improper trades may have had on pricing, opportunity costs from redeployed capital from or to other investments, lost time and resources related to managing and liquidating the portfolio after revoking Aperçu's Power of Attorney, and foregone management fees.

Am. Compl. ¶¶ 65, 70, 76, and 80.

Under Kentucky law, sophisticated parties with similar bargaining power may contract for exculpatory provisions that preclude, for example, certain claims, losses, and damages. *See Cumberland Valley Contractors, Inc. v. Bell Cty. Coal Corp.*, 238 S.W.3d 644, 649 – 51 (Ky. 2007). The parties do not dispute the validity of the TAA provisions, however, the parties haggle over proper interpretation.

TAA Section 2, which is entitled "Maintenance of the Assets," says that:

> [Aperçu] shall have no liability … for any loss, damage, cost or expense arising out of or related to the use of …. [a] bank as a custodian of the Assets, or for the payment of any

5

> fees or … margin related to such trading or custody agreements, all of which shall be the responsibility of [RQSI].

ECF No. 1-2. Section 8 of the agreement, which is entitled "Liability of the ADVISOR," says that "All transactions in options and futures … shall be for the account and risk of [RQSI]." Under the TAA, Aperçu is not liable

> for any losses sustained in connection with such transaction [in options and futures] or for any errors, acts or omissions committed by … other third parties, unless caused by the gross negligence or willful misconduct of [Aperçu].

In interpreting these provisions, general principles of contract interpretation mandate that specific provisions prevail over more general ones. *See, e.g.*, Rest. (Second) of Contracts 203(c) (1979) ("specific terms and exact terms are given greater weight than general language ..."); *see also Kuykendall v. Kuykendall*, No. 1:05CV-208-R, (W.D. Ky. June 9, 2006); *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014). Further, "In determining a contract's plain meaning, the court is 'obligated to read the parts of the contract as a whole,' and when possible should embrace an interpretation that 'promote[s] harmony between ... provisions.'" *Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 676 (6th Cir. 2012) (quoting *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F.Supp. 948, 964 (E.D. Ky. 1994)). Lastly, "an interpretation of the contract that gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Journey Acquisition-II*, 39 F. Supp. 3d at 887 (internal citations and quotations omitted).

While Defendants argue that Section 2 is the more specific – and therefore controlling – provision, RSQI argues that Section 8 deserves this recognition. Both argue that adhering to the other's interpretation would render another section meaningless.

The Court finds Section 2 explicitly disclaims liability for specific damages – "loss, damage, cost or expense arising out of or related to the use of [a] bank as a custodian of the

assets" and "the payment of any … margin related to such trading or custody agreement." Section 2 specifically deals with the maintenance of assets, including RSQI's relationship with its custodian of assets - Société Générale. Any fee or payment for maintenance costs, including costs associated with a margin call, RSQI waived in Section 2. Section 8 covers liability for general losses related to *options and futures trading*. The contract clearly indicates that the Defendants would not be held liable for damages related to maintaining the assets. Hence, RSQI waived losses related to maintaining the margin account.

This interpretation does not, as RQSI contends, render Section 8 meaningless. Section 8 still controls Aperçu's general liability concerning trading losses, which are distinct from losses due to margin-related payments that are required to maintain the margin account. Both Sections 2 and 8 can coexist in the TAA.

However, the Court does not find persuasive Defendants' arguments that RQSI has failed to allege any proper damages. Defendants argue that RSQI is not entitled to loss of invested funds or opportunity costs because RQSI agreed to the highly risky and speculative strategy in the TAA. Defs.' Memo. Supp. Mot. Dismiss 12. The parties also agreed to Section 8, which allows liability related to trading if Aperçu acted with gross negligence or willful misconduct. Therefore, RSQI may allege damages from loss of invested funds or opportunity costs.

Furthermore, Defendants argue that the remaining damages either derive from the margin call or are "wildly speculative." *Id.* 12 – 13. RQSI responds that damages resulting from the margin call only account for a small portion of overall damages. Neither party provides sufficient argument as to why or why not certain alleged damages derive from the relevant margin call. Instead, both offer terse and conclusory statements about whether these damages are derivative. This is insufficient for the Court to dismiss the claims.

RSQI also seeks damages it describes as "effects of any market impact that Aperçu and Wilkinson's improper trades may have had on pricing." Amd. Compl. ¶¶ 65, 70, 76, and 80. Defendants contend these are speculative and insufficient to overcome the Rule 12(b)(6) standard. The Court agrees. These are not merely uncalculated damages, but damages described as merely a possibility – *any* market impact that these trades *may have had* on pricing.

RSQI cannot seek damages to the extent that they are pleaded as merely possible and to the extent that they relate to maintaining the margin account – including those related to Société Générale's margin call.

**2. Gross Negligence**

Under Kentucky law, a gross negligence claim must establish that (1) Defendants owed RSQI a duty of care; (2) Defendants breached that duty; (3) the breach proximately caused damages; and (4) Defendants acted with "malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed that the act was malicious or willful." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51 (Ky. 2003); *see also Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003).

Whether Defendants owed RSQI a duty of care is a question of law that this Court determines. *Pathways*, 113 S.W.3d at 88. The duty of care must be independent of any contractual obligation. *Mims v. W.-S. Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007) (holding that a failure to perform a contract does not give rise to liability in tort unless plaintiff can demonstrate an independent legal duty); *Tunne v. Hendrick*, No. 5:10CV-00181-JHM (W.D. Ky. Aug. 24, 2012).

RSQI alleges in its amended complaint that Defendants owed it "a duty of care to act with utmost good faith, ensure full and fair disclosure of all material facts, and take reasonable

care to avoid misleading clients." ¶ 63. While contractual duties cover some of these enumerated duties, Aperçu also owed RSQI an extra-contractual fiduciary duty.

In assessing whether investment advisors and similar financial advisors such as commodities brokers owe a fiduciary duty beyond the contract to clients, courts consider the degree to which the advisor has discretion over the client's funds. *See Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs.*, Ltd., 823 F.2d 171, 173 (7th Cir. 1987). "The extent of a broker's obligation to a customer depends upon the nature of the customer's account." *J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.*, 907 F.2d 150 (6th Cir. 1990). A non-discretionary account, for example, requires the client to give approval for every transaction. *Id.* at 150 n.9. On the other hand, a discretionary account allows the advising broker to execute investments or purchase stock options without approval for every action. *Id.* "Only a broker operating a discretionary account-in which the broker determines which investments to make-is viewed as a fiduciary." *Id.* (quoting *Heritage Capital Advisory Servs., Ltd.*, 823 F.2d at 173).

Aperçu acted as a commodities trading advisor for RQSI. Under the TAA, Aperçu had "the authority to purchase and sell options and futures … at its discretion, provided that [Aperçu] trad[ed] … in accordance with the Trading Program, policies and strategies identified in writing to [Aperçu]." TAA § 1. As Aperçu was a trading advisor with discretion over RQSI's assets to make trades in line with the TAA, Aperçu owed RSQI a fiduciary duty beyond the contract.

Regardless, RSQI has not sufficiently alleged Defendants acted with "malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed that the act was malicious or willful." *Phelps*, 103 S.W.3d at 51. RQSI alleges Defendants took risks in investing in order to increase profits in the portfolio, which would benefit both RSQI and Defendants. Am. Compl. ¶ 64. RSQI calls foul the alleged aggressive

increase in risk in order to increase profits. However, this cannot rise to an utter and wanton disregard of RSQI's rights. Defendants acted in such a way that would, if successful, enrich all parties. Indeed, the risky strategy had created over a million dollars in profits fairly early in its implementation. *See* Am. Compl. ¶ 36. While Defendants may have taken on risk, the amended complaint shows they did so for the benefit of all parties. This alone is not enough to meet the element of malice. Therefore, the amended gross negligence allegation is insufficient to state a claim for relief under Fed. R. Civ. P. 12(b)(6).

The Court will dismiss RSQI's gross negligence claim.

### 3. Fraudulent Misrepresentation

Under Kentucky law, a fraudulent misrepresentation claim must establish by clear and convincing evidence "(1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009); *see also*, *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 632 (6th Cir. 2013). The plaintiff must reasonably rely on the misrepresentation. *Flegles*, 289 S.W.3d at 549. Furthermore, Fed. R. Civ. P. 9(b) imposes heightened pleading requirements for fraud claims.

The misrepresentation must also concern a past or present material fact. *Id.* "A mere statement of opinion or prediction may not be the basis of an action." *Id.* (quotation and citation omitted). For example, "forward-looking opinions about investment prospects or future sales performance such as those involved in this case generally cannot be the basis for a fraud claim." *Id.* However, two narrow exceptions exist to this general rule: "where the opinion either

10

incorporates falsified past or present facts or is so contrary to the true current state of affairs that the purported prediction is an obvious sham." *Id.* "[A]bsent misrepresentation of objective data, 'forward-looking recommendations and opinions are not actionable ... merely because they are misguided, imprudent or overly optimistic.'" *Id.* (quoting *In re Salomon Analyst AT&T Litigation*, 350 F.Supp.2d 455, 467 (S.D.N.Y. 2004)).

RQSI alleges three fraudulent statements as the basis for its fraudulent misrepresentation claim. The Court will consider each in turn.

The first allegation concerns Wilkinson's statement that:

> throughout July and August 2015 that the rise in the margin requirement beyond the agreed upon limit and the higher than expected volatility of the portfolio did not actually reflect an increase in risk but was merely a temporary issue related to volatility in mark-to-market of options and/or additional hedging needs necessary to preserve gains.

Am. Compl. ¶ 67. RSQI argues that the rise in margin requirement and higher volatility did correspond with increased risk. However, regardless of the outcome of the trading strategy, the alleged statement is a subjective opinion that is not connected to a concrete factual statement. The statement concerns an opinion of the perceived level of risk based on market and portfolio fluctuations.

RSQI argues that the falsified fact exception applies because the representation was based on a falsified fact used to justify the risk increase, specifically "the additional and temporary hedging needs that [Wilkinson] claimed were necessary to preserve gains." Pl.'s Resp. 22, ECF No. 7; *see also* Am. Compl. ¶ 50. This is not a fact. There are no indicia of a concrete factual statement.

The second allegation concerns Wilkinson's statement that:

11

> during this time period that internal Aperçu risk reports supported the claim that the strategy contained an 'embedded tail hedge,' such that it would be profitable in a large market downturn.

Am. Compl. ¶ 67. An embedded tail hedge is an investment strategy where profitability occurs in extreme market downturns. RQSI argues that subsequent market actions coupled with trading losses show that there was not an embedded tail hedge, and that Aperçu's risk reports could not have been accurate. This allegation, however, does not concern a false statement. RQSI does not allege that Defendants believed the internal report was inaccurate or that Defendants falsified the report. Wilkinson relaying the contents of Aperçu's internal report – regardless of the soundness of that report – is not a misrepresentation.

RSQI argues in a conclusory fashion in its response that "Wilkinson's claim regarding the strategy's supposed embedded tail hedge was also based on falsified facts, as shown by later risk reports revealing that Aperçu's reports and simulations could not possibly have been factually accurate." Pl.'s Resp. 22. Again, there is no allegation anyone falsified the underlying reports. Relying on a supposedly unsound report in representing its contents without anything else is not fraudulently misrepresenting the report.

The third allegation concerns Wilkinson's statement that:

> ample liquidity existed in the long-dated "Long Vol" portion of the trade, such that it could be efficiently exited over the course of a few weeks.

Am. Compl. ¶ 67. "An asset is generally described as liquid if it can be easily and quickly sold for cash at minimal cost and price impact." Franklin Allen and Patrick Bolton, *Liquidity and Financial Instability: An Introduction*, J. Eur. Econ. Ass'n, Dec. 2004, at 925. Liquidity is defined in terms of degree rather than in the absolute terms of liquid or illiquid. *Id.*; *see also*, *Market Liquidity: A Primer*, Douglas J. Elliot, The Brookings Institute, June 2015. There are various technical approaches to measuring liquidity – these include the current ratio, the quick

ratio, the operating cash flow ratio, and many others. *See generally*, Brian D. Kluger and Jens Stephan, *Alternative Liquidity Measures and Stock Returns*, 8 Rev. Quantitative Fin. & Acct. 19, 19 (1997). There is not a consensus measurement on liquidity, however, and RSQI's allegations do not suggest Wilkinson's statements relied on a specific technical measurement. Whether an asset could be sold in a period of time based on an assessment of current liquidity is not a concrete fact – it is an opinion.

In this case, it was Wilkinson's opinion, acting as a trading advisor, that the long-dated "Long Vol" could be "exited" within a few weeks. This is similar to a realtor informing a client that home could be sold in a few weeks after considering the property's value in current market conditions. The realtor is not stating a fact. He is stating an opinion of how quickly the property will sell. Wilkinson acted similarly.

RSQI argues that these representations were based on falsified facts because the options were actually illiquid and "Wilkinson was manipulating the market for these options in order to maintain short-term paper profits which he fully knew could never be realized at liquidation." Pl.'s Resp. 22. Again, liquidity as used here is not a definite, concrete fact, nor is Wilkinson's alleged manipulation of the market.

The Court will dismiss RSQI's fraudulent misrepresentation claim.

**4. Fraud by Omission**

A duty to disclose provides the basis for a fraud by omission claim. *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011). To prevail, RSQI must establish that:

> (1) the defendant had a duty to disclose the material fact at issue;
> (2) the defendant failed to disclose the fact;
> (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and
> (4) the plaintiff suffered actual damages as a consequence.

13

*Id.* There is a duty to disclose if there is (1) a confidential or fiduciary relationship between the parties; (2) a statute mandating the duty; (3) partially disclosed material facts that create the impression of full disclosure; and (4) a party to contract with superior knowledge and that party is "relied upon to disclose same." *Id.* at 748.

Fed. R. Civ. Pro. 9(b) requires heightened pleading requirements for fraud by omission claims. Rule 9 is, in part, designed "to prevent fishing expeditions ... and to narrow potentially wide-ranging discovery to relevant matters." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011). To maintain the fraud by omission claim, RSQI must plead "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what Appellees obtained as a consequence of the alleged fraud*." Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). The plaintiff must do more than present "vague allegations." *Id.*

RSQI argues that Defendants had a duty to disclose because their "investment advisory relationship with [RSQI]" created "a fiduciary relationship existed between the parties;" and also because Defendants "had superior knowledge of the true nature of the risk." Am. Compl. ¶ 73. As previously discussed, Aperçu owed RSQI a fiduciary duty beyond the contract. Therefore, Aperçu owed RSQI a duty to disclose.

Defendants' alleged omissions, however, are not *facts*. The alleged omissions are: (1) "that in July and August 2015 … [Wilkinson] concealed the true facts of the reality and extremity of the risk" in trading, Am. Compl. ¶ 74; (2) "that [Wilkinson] was amassing excessively large positions in several of his largest holdings as a percentage of open interest," Am. Compl. ¶ 74; (3) and that Wilkinson "was manipulating the market … to maintain short-term paper profits which he fully knew could never be realized at liquidation." Pl.'s Resp. 27.

First, similar to liquidity, risk is defined in degrees and is largely subjective. Whether risk is extreme, for example, is a matter of opinion. What is an acceptable amount of risk, especially for a client that had already agreed this particular strategy was risky, TAA § 7(f), is even more elusive. For similar reasons, an excessively large position is a matter of opinion and objectively immeasurable.

RQSI also alleges that Wilkinson concealed that he manipulated the market in such a way to show short-term profits that "he fully knew could never be realized at liquidation." Pl.'s Resp. 27. This is a conclusory statement that is insufficient under Rule 9(b) and Rule 12(b)(6). RQSI does not provide any support for its assertion that Wilkinson knew profits could never be realized because of his positions.

The Court will dismiss RSQI's fraud by omission claims.

## 5. Breach of Contract

To establish a breach of contract claim under Kentucky law, a plaintiff must show: "the contract, the breach and the facts which show the loss or damage by reason of the breach." *Shane v. Bunzl Distribution USA, Inc.*, 200 Fed. Appx. 397, 402 (6th Cir. 2006) (quoting *Fannin v. Commercial Credit Corp.*, 249 S.W.2d 826, 827 (Ky.1952)).

The TAA limits liability on a breach of contract claim to Aperçu's gross negligence or willful misconduct. *See* TAA, Section 8. Further, as previously discussed, Defendants are not liable under the TAA for losses related to margin-related payments required to maintain the margin account.[1] However, Defendants may be liable to the extent they acted with gross

---

[1] In a footnote, RSQI suggests in a passing comment that TAA Section 9 "clarifies that the Fund is entitled to assert claims of breach of contract even in the absence of gross negligence by Defendants." Pl.'s Resp. 28, n.33. Neither in its amended complaint nor response does RSQI explain liability on this premise. Indeed, Section 9 is an indemnification provision that does not apply in a breach of contract matter between the parties.

negligence or willful misconduct in connection with any losses sustained in trading options or futures.

RSQI alleges Defendants breached the contract in three ways: (1) breaching the margin requirement in TAA Schedule A; (2) acting in a manner that was not within Aperçu's reasonable judgment to achieve RSQI's investment objectives consistent with the trading program, policies, and strategies identified; and (3) failing to promptly notify RSQI of any material changes in trading approaches or strategies in managing the relevant assets. Am. Compl. ¶¶ 78 – 80.

In each instance, RQSI alleges a gross negligence or willful misconduct in conclusory terms. "[T]he allegations of the Amended Complaint confirm that [RSQI's] damages, including those resulting from the … margin call were a product of the gross negligence or willful misconduct of Defendants." Pl.'s Resp. 28. While RSQI does discuss factual allegations in its narrative exposition, RSQI makes no attempt explain how the factual allegations constitute – or even relate to – gross negligence or willful misconduct. This is insufficient to meet the Rule 12(b)(6) pleading standards, which require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotation marks and alteration omitted).

The Court will dismiss RSQI's breach of contract claim.

## CONCLUSION

The Court will dismiss all RSQI's claims with prejudice.

The Court will enter a separate order in accordance with this opinion.

April 13, 2016

Charles R. Simpson III, Senior Judge
United States District Court